| 9p | 577 |
| 128 | 348 |
| 128 | 349 |
| 128 | 350 |

**THE MAYOR & ALDERMEN OF THE CITY OF MOBILE *vs.* ESLAVA.**

1. Where land lying upon navigable water, has other fixed metes and bounds than the shore, the owner of such land is not entitled to reclamations by alluvian, as a riparian proprietor.

2. According to the common law, it was competent for the sovereign to grant the shore, where the *jus publicum* was not to be disturbed. Such a grant conferred upon its grantee, the right (if no other) of appropriating the shore, after it had become derelict.

3. The King of Spain, in virtue of the *bulls of Pope Alexander VI*, became the proprietor of the Spanish possessions in America, and could grant the shore of the navigable waters in his American colonies. And the power possessed by the King, in this particular, might be exercised by his Viceroys, and other subordinates, within their respective jurisdictions.

4. Where a grant is made by a public and responsible officer, claiming and exercising the right of disposing of the public domain, it will be presumed that he did it by the order and consent of the government he professes to represent, or in whose name he acts; and, in the absence of proof to the contrary, it will be intended, that he disposed of no more property of his sovereign, than the laws of Spain authorised.

5. The act of Congress, of the 26th of May, 1824, entitled "an act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city," does not assert a title on the part of the United States, but is only a renunciation of whatever title the government has, or may be supposed to have, to so much of the shore as is described in it.

6. The navigable waters of this State, having, by express stipulation, been declared "public highways, free to the citizens of said State, and the United States, without any tax, duty, impost or toll therefor, imposed by the State,"—it is not competent for Congress to grant the shore.

7. By the act of 1819, " to enable the people of the Alabama Territory to form a constitution," &c. it is provided, that " said territory, when formed into a State, shall be admitted *into the* Union, upon the same footing with the original States, in all respects whatever." Now, as the original States have the *exclusive right of property* over the tide waters within their limits, subject to the *jus publicum*, it follows, that this State possesses a similar right; and no grant of property in the shore, to an individual, by Congress, is authorised by its constitutional powers.

8. By the acts of Congress, regulating the survey and disposal of the public lands, the Federal government has renounced the title to the navigable waters within this State, and the soil covered by them; consequently, the proceedings under the act of April, 1818, " authorising the disposal of certain lots of public ground in the city of New Orleans and town of Mobile"—cannot be considered as a dedication of the shore to the uses of the city of Mobile.

9. By the admission of Alabama into the Union, without a reservation of the right of property in its navigable waters, the State succeeded to all the right of the United States, except so far as it was reserved by the Federal constitution, in some of its grants, or its retention was necessary to enable Congress to exercise its delegated powers.

10. The navigable waters extend not only to low, but embrace the soil even to high water mark.

Error to Mobile Circuit court.

Trespass to try title—before *Pickens, J.*

The plaintiffs in error brought an action of trespass, against the defendant, in the Circuit court of Mobile, to try the title to, and recover the possession of, a certain lot or tract of land, situate in the city of Mobile.   On the trial, the presiding judge sealed and certified a bill of exceptions, from which, among other things, it appears that " by an act of Congress, passed in the year eighteen

hundred and eighteen," the President was authorised to cause the ground whereon Fort Charlotte, in the town of Mobile, was then situated, to be laid off into lots, with suitable streets and avenues, conforming, as near as might be, to the original plan of that town. When the survey was completed, one plat thereof, was directed by the act to be returned to the Secretary of the Treasury, and another, to such officer or agent as the President should authorise, to dispose of the lots thus surveyed: and the lots were required to be offered at public sale, in the town of Mobile, in the same manner, and on the same terms, as was provided on the sale of the public lands. Pursuant to the provisions of this act of Congress, a survey was made by Silas Dinsmore, and approved by the Surveyor General of the United States—the plats made out, and one of them returned to the Secretary of the Treasury. The site of Fort Charlotte was laid off, into ten squares and parts of squares, all of which were sub-divided into lots, and streets were laid off over the ground on which the fort was situated, conforming, as near as practicable, to the original plan of the town. By the original plan of the town, a street known as Water street, was run on the margin of the Mobile river, continuous with, and immediately fronting on the same. By the survey of Mr. Dinsmore, Water street was extended over a part of the site of the fort, conforming in width and course, to its original location. This street was laid off in the margin of the river, contained within the limits of the fort, and running nearly north and south with the river, on its eastern side.

Another street, known as Church street, was extended

over the site of the fort, from the west, to Water street, on the east, in conformity to the original plan of the town, so that Church and Water streets met each other at nearly right angles at the margin of the river, and within the limits of the fort.

The lots were sold by the United States, agreeably to the plat returned to the Secretary of the Treasury, and none were either laid off or sold to the east of Water street.

The lot now in controversy, is situated on the east side of Water street, directly in front of the lots 10, 11, 12 and 13, in square 1, (as designated in the survey of Mr. Dinsmore,) and runs eastwardly, across Commerce street, into the river.    The lots number 10, 11, 12 and 13, are situate on the site of Fort Charlotte; and the lot in dispute, is situated on the open space, between high and low water mark, in front of the fort, and between it and the river, and within the limits of the picket fence that once surrounded the fort.    The sale of the Fort Charlotte lots, took place on the ——— day of ———, eighteen hundred and twenty, and were purchased by a company, known as the Lot Company of Mobile.    The company caused another survey of the premises, by Mr. Hubborn, including a larger quantity of ground than was embraced in the survey and plat of Dinsmore.    They altered the position of Church street, by placing that part of it adjoining Water street, about thirty feet south of where Dinsmore had located it—Water street was continued in the same place, and was represented as sixty feet wide.    The streets laid off by Dinsmore, as altered by the lot company, have since that time been recognised as the proper

streets of the city. On the ———— day of ————, eighteen hundred and twenty-two, the lot company made a sale of the Fort Charlotte lots.

It was shown by the proof, that there is a regular oceanic tide in the river Mobile, the flow and ebb of which, vary about eighteen inches, or two feet. In eighteen hundred and twenty-two, Water street, and the property now in dispute, were between high and low water mark. In eighteen hundred and twenty-three, the corporation of the city of Mobile, appropriated and expended four hundred dollars, in filling up of Water street, between Church and Government streets—and by the improvement, confined the water, at high tide, to the eastern edge of Water street. The lot in controversy, from Water to Commerce streets, and the ground now forming the latter street, on the east, was between high and low water marks. No evidence was offered to show, that the lots on the site of Fort Charlotte, immediately west of the property claimed by the plaintiffs, were known under the Spanish government, as water lots, whereon improvements had been made.

The plaintiffs read to the jury, as evidence of title, an act of Congress, entitled "an act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city," passed 20th May, 1824.

The defendant, on his part, then read to the jury, the act of Congress authorising the sale of Fort Charlotte— the patents from the United States, to William Barnett, John B. Hogan, Francis W. Armstrong, Edward Hall and Addin Lewis, to each of the lots nearest the water, which were surveyed under the authority of the United States,

on the site of Fort Charlotte. These patents recite, that the grantees were the purchasers at the government sale of the lots, and had made full payment therefor,—in consideration of all which, the United States conveys the title to the grantees.

The defendant then gave in evidence, deeds from the grantees to Charles Mathews, for a portion of the land sued for, and for another portion to Addin Lewis, and from Addin Lewis, to Charles Mathews:—all these deeds were dated in eighteen hundred and twenty-two, a period subsequent to the issuance of the patents.

The premises in question, is in front of lots 10, 11, 12, 13, 14 and 15, in square 1. At the time of Dinmore's survey, it was in proof, that the eastern lines of these lots, were below high water mark. One of the witnesses stated, that in order to reclaim one of the lots in square 2, he had to fill up seven feet; and that he could not pass along Water street, at that time, without the aid of logs and timbers. "Another witness testified, that he purchased the lot right west of the lots aforesaid—that he had to fill up his lot before it could be employed; and other evidence was given by defendant, conducing to prove that the eastern lines of the lots, at the date of the sale, was below high water mark." It was further shewn by the defendant, that the *lot company*, after their purchase, expended about three thousand dollars in the improvement of their property, and to exclude the water from it—and that shortly after the purchase of the premises in dispute, by Addin Lewis, he caused dirt to be hauled upon it—and that he leased it to one Cox, who laid down timbers, in order to force out the water, and

fit it for a lumber yard. This took place in eighteen hundred and twenty-two, or eighteen hundred and twenty-three.

It was also proved, that Charles Mathews, in eighteen hundred and twenty-three, or eighteen hundred and twenty-four, expended one thousand dollars, in filling up his lot. With ths view of showing improvements, previous to eighteen hundred and twenty-four, the defendant read from the book of the corporation, the following minute, dated in eighteen hundred and twenty-three: "Charles L. Mathews having improved his lot, by filling it up, and a stagnant pond being occasioned thereby, at the end of Church street," &c. In eighteen hundred and twenty-four, it appeared that about one-half the space between Water and Commerce streets, was subject to be covered by water, at the ordinary tides.

All the witnesses stated, that the eastern boundary of the lots on the site of Fort Charlotte, was about the western line of Water street, as indicated by the stakes placed there. It was in evidence, that Water street was not opened as far south as Church street, until eighteen hundred and twenty-four, when it was extended, by an act of the corporation of the city of Mobile.

The defendant offered evidence, to prove that in eighteen hundred and twenty-three, and for every year since, till eighteen hundred and thirty-six, (excepting intervals of four years, about which no testimony was given,) that he or they, under whom he claimed, had paid taxes on the property in question, to the corporation, upon the assessment of its officers—and further, that in eighteen hundred and twenty-four, or eighteen hundred and twen-

ty-five, Charles Mathews had been required to pay for side-walks around it, by the corporation—that the mayor of the city, in eighteen hundred and thirty three, required him to fill up the low places upon it, with earth or shells —and that about the time last mentioned, it was advertised for sale, as the property of the defendant, for unpaid taxes assessed upon it; which taxes, together with the expenses of the advertisement, were afterwards paid to the corporation.

It further appears from the bill of exceptions, that the defendant, Miguel D. Eslava, was in possession of the premises, as the tenant of Charles L. Mathews, at the commencement of the suit, and service of the writ—and that Mathews was permitted to defend, instead of his tenant, by an order of the court.

We are further informed, that it was agreed by the parties, that the map of the survey made by Dinsmore, should be made a part of the bill of exceptions—and, in conformity to that agreement, a copy of the map accompanies the record.

The presiding judge charged the jury as follows: "If the lots specified in the patents, (10, 11, 12, &c.) were proved to have been bounded by high water mark, at the time purchased, then they came within the terms of lots known under the Spanish government, as water lots," as used in the act of Congress; and if proved that the lot claimed, was east of Water street, and in front of the lots covered by the patents, and *that* they had been improved, before the passage of the act, it was vested in the proprietors and occupants of the lots, held under the patents—and this, although Water street did intervene

between the lots claimed, and those held under the patents."

The jury were further instructed, "that if the proof satisfied them, that in August, eighteen hundred and twenty-three, the mayor and aldermen, in reference to this lot, had on their minutes, used this language, viz., 'whereas, Charles Mathews has commenced to improve his lot, by filling up,' &c.—and that a committee was organised to enquire into a nuisance connected with the lot; and that for eighteen hundred and twenty-four, and for four or five of the years between that and the commencement of the suit, the city taxes had been assessed on this property, and collected from Mathews; and that Mathews, in eighteen hundred and twenty-four, or eighteen hundred and twenty-five, had been required by an ordinance of the mayor and aldermen, to make side walks along the lot, and had so done; and that Mathews had, by a written notice issued by the mayor, been required to fill up some low places on said lot, to abate a nuisance thereon; and that this property was advertised for sale, as the property of Mathews, in one of the city papers, for the non-payment of city taxes assessed thereon; and that subsequently, Mathews had paid such taxes, and the expences of the advertisement, into the city treasury,—then such facts would estop the plaintiffs to assert any pre-existing title, they may have had under the act of Congress, if any.

"The plaintiffs' counsel requested the judge to charge the jury, that if they believed the facts were proved as contended for by them, that the plaintiffs were entitled to a verdict in their favor: which instruction the judge

declined to give." A verdict being found for defendant, and judgment rendered in favor of Éslava, the plaintiffs have prosecuted a writ of error to this court.

*James Martin & Hale,* for plaintiffs in error.
*J. A. Campbell,* contra.

COLLIER, C. J.—It will be premised, that the property in controversy, is situated directly east of the site on which Fort Charlotte stood, in the city of Mobile. The lots laid off on the *area* covered by the fort, at the time of their survey and sale, extended east, to the margin of the shore, and at some points, even included a part of the shore, while still farther east, and immediately adjoining, was laid down on the plat, " water street," then almost, if not entirely unreclaimed. East of Water street, and west of the channel of the river, is situated the premises, the title to which is now controverted.

The plaintiffs insist upon their right to recover, because of a dedication by the United States, to the use of the city. And the plaintiffs and defendant respectively contend, that the title of each is complete, under an act of Congress passed on the twenty-sixth of May, eighteen hundred and twenty-four, " granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city."

By an act of Congress, of the twentieth of April, eighteen hundred and eighteen, the President of the United States was authorised, whenever, in his opinion, it should be consistent with the public interest to abandon the use of Fort Charlotte, at Mobile, and to cause the lot of

ground whereon it then stood, to be surveyed, and laid off into lots, with suitable streets and avenues, conforming, as near as practicable, to the original plan of the town.   The act further directs, when the survey is completed, one plat thereof shall be returned to the Secretary of the Treasury, and another to such officer or agent as the President shall have authorised to dispose of the lots; and the lots shall be offered at public sale at Mobile, on such day as the President, by his proclamation, shall designate, in the same manner, and on the same conditions and terms of credit, as is provided by law, for the sale of the public lands by the United States—(6 vol. Laws of the U. S.; 1 vol. Land Laws, (ed. 1838,) 303.)

In obedience to this law, a survey was made of the site of Fort Charlotte, and the lots there laid off, were sold in eighteen hundred and twenty, and the landlord of the defendant became the proprietor, under a conveyance from the purchasers at that sale, of the lots lying west of the property now sought to be recovered.

The defendant does not rely upon his riparian proprietorship, as entitling him to the land east of Water street, nor indeed could he insist on it with success, as the Fort Charlotte lots were not bounded by the river, but had other fixed metes and bounds.

The act of Congress of eighteen hundred and twenty-four, on which the parties mainly rest their pretensions, enacts, 1. "that all the right and claim of the United States, to the lots known as the hospital and bake-house lots, containing about three-fourths of an acre of land, in the city of Mobile, in the State of Alabama; and also all the right and claim of the United States, to all the lots

not sold or confirmed to individuals, either by this or any former act, and to which no equitable title exists in favor of any individual, under this or any former act, between high water mark and the channel of the river, and between Church street and North Boundary street, in front of the said city, be, and the same are hereby vested in the mayor and aldermen of the said city of Mobile, for the time being, and their successors in office, for the sole use and benefit of the said city forever.

2 "That all the right and claim of the United States, to so many of the lots of ground east of Water street, and between Church street and North Boundary street, (now known as water lots,) as are situate between the channel of the river, and the front of the lots, known under the Spanish government, as water lots, in the said city of Mobile, whereon improvements have been made,—be, and the same are hereby vested in the several proprietors and occupants of each of the lots heretofore fronting on the river Mobile, except in cases where such proprietor or occupant has alienated his right to any such lot now designated as a water lot, or the Spanish government has made a new grant or order of survey for the same, during the time at which they had the power to grant the same; in which case, the right and claim of the United States shall be, and is hereby vested in the person to whom such alienation, grant, or order of survey was made, or in his legal representative : *Provided*, that nothing in this act contained, shall be construed to affect the claim or claims, if any such there be, of any individual or individuals, or of any body politic or corporate"— (7 vol. Laws of the U. S. 318; 1 vol. Land Laws, (ed. 1838,) 398.)

Though the city of Mobile existed as a town long anterior to the treaties of *St. Ildefonso* and *Paris*, yet even since the latter period, extensive reclamations have been made of the shore of the river which bounds it on the east, as well by alluvion, as by the employment of artificial agents. In this way, several streets have been added in the eastern part of the city, running north and south,-so that at this time, the principal seat of commercial business is on ground rescued from a bed of water, since the Spanish authorities yielded the possession to the United States. Among these new streets, is Water street—in eighteen hundred and twenty-four, it was probably the most eastern street throughout the entire front of the city,—at any rate, there was none east of it in front of Fort Charlotte.

Waiving a particular examination of the act of eighteen hundred and twenty four, we proceed to consider an argument made for the defendant, which, if well founded, will render unnecessary an analysis of the act. It was argued for the defendant, that even if the act of eighteen hundred and twenty-four, according to a just interpretation of its terms, conferred upon the plaintiffs the interest of the United States in the property in question, yet the act was wholly inoperative, because no title was vested in the United States, which could be granted by Congress—That the act of eighteen hundred and nineteen, to enable the people of the Alabama Territory, to form a constitution, for the purpose of admission into the Union, on an equal footing with the original States, dedicated, *in express terms*, to the free use of the citizens of this State and the United States, the navigable waters

within the limits of the former.  That this dedication embraced so much of the soil as was covered by water, not only at low, but at high tide, so as to place it beyond the just powers of the Federal government to grant the same—(1 vol. Land Laws, (ed. of 1838,) 310; Toulmin's Ala. Dig. 913.)  *And further*—that as the sovereign power of the State, is the proprietor of the tide-waters, in trust, for a public, it is incompetent, even by an act of legislation, to grant the space intervening between high and low water marks.

One of the learned counsel for the defendant, supposing the case of Hagan et al. vs. Campbell et al. (8 Porter's Rep. 9,) to be a decision adverse to the latter argument, has insisted that it is opposed by the best authority, and should be overruled by the court.  Before we consider the first argument, we will briefly review the case of Hagan et al. vs. Campbell et al., so far as it has been drawn in question.  We do not propose to consider the general power of the sovereign over the tide waters, because such an enquiry is wholly unnecessary ; but we will undertake to show, that the conclusion of the court in the case referred to, is defensible both in principle and upon authority, whether the rule of decision is drawn from the English common law, or the laws and usages of Spain.

According to the common law, not only the dominion over the sea adjoining the coasts, and over arms of the sea and navigable rivers, but the right of property in the soil thereof, is also vested in the King.  This proceeds from the policy of the common law, to assign to every thing capable of occupancy, or susceptible of ownership,

a legal and certain proprietor.   Notwithstanding the pro-
perty in the tide waters, is vested in the sovereign to high
water màrk, yet the people are entitled to their use, for
the purpose of navigation and fishing.   Thus far, the
King may be regarded as a trustee for the public, and,
upon principle, it would seem, might make such disposi-
tion of the soil, as would not impair or destroy the public
right.

The King may grant the soil of tide waters to an in-
dividual, yet the grantee cannot so exercise his right of
property, as to injure the paramount right of navigation.
The interest of the grantee, has been aptly compared to
that of a person who owns the fee simple of a road, who,
when the road is discontinued, may appropriate the
ground to his own purposes, but until then, he cannot
obstruct its passage.   Lord Hale says, that the *jus priva-
tum* of the proprietor, is subject to the *jus publicum* of the
community.   How far the grantee of the soil may make
reclamations, so that he does not disturb navigation, is
an interesting question, about which there is a want of
entire harmony in the *dicta* and decisions on this branch
of the law.   All, however, agree, that as the shore be-
comes derelict by the receding of the waters, he may ap-
propiate it to private purposes—(Angell on Tide Waters,
29, 33, 34, 135 to 143 ; Rex vs. Lord Grosvenor et al. 2
Starkie's R. 511 ; Blundell vs. Catterall, 5 Barn. & Ald.
R. 268; Harg. Tracts, 32; The Attorney General vs. Rich-
ards, 1 Anstruther's R. 603.)

In Hagan et al. vs. Campbell et al. the confirmatory
grant made by the authorities of Spain, extended the title
of the grantees, across the shore to the channel of the

river. According to the common law, such grant was unobjectionable—it neither expressly or impliedly authorised any interference with the public right of navigation, nor did it appear that it had produced such a result. But if it had been attempted to be made the instrument of injury to the public, the grant would not thereby have been rendered void—the preventive power of the law, by its interposition, might have restrained it to a legitimate purpose. For any thing disclosed by the record in that case, it may have been the intention to convey a title to the soil, without conferring an authority to occupy it, until it had ceased to be covered by the water, nor did it appear that it was occupied at an earlier period. It is, then, clear, that the grant, on its face, -if tested by the rules of the common law, is valid.

We will now consider the grant in reference to the laws and usages of Spain, touching her colonial possessions. The power of Spain, at the time its earliest establishments in America were made, had perhaps far outstripped any kingdom in Europe. Its monarchs having extended their powers far beyond the limits which once circumscribed the regal authority, were hardly subject to control in concerting or executing their measures. They acknowledged no constitutional restraint, but as independent masters of their own resolves, they issued the edicts requisite for modelling the government of the new colonies, by a mere act of prerogative.

The early interposition of the Spanish crown, in order to regulate the policy and trade of its colonies, is a peculiarity which distinguishes their progress from that of the colonies of any other European nation. The Portu-

guese, the English, and French, considered the advanta-
ges promised by the regions occupied by them in Ameri-
ca, as so remote and uncertain, that their colonies were
suffered to struggle through a hard infancy, almost with-
out aid or protection from the parent state. But gold
and silver, the first productions of the Spanish settlements
in the New World, were more alluring, and immediately
attracted the attention of their monarch. Though they
had contributed little to the discovery, and almost nothing
to the conquest, of the New World, they instantly as-
sumed the function of its legislators; and having ac-
quired a species of dominion formerly unknown, formed
a plan for exercising it, to which nothing similar occurs
in the history of human affairs.

It was a fundamental maxim of Spanish jurisprudence,
with respect to America, to consider its acquisitions there,
as vested in the crown, rather than the state. By the
bulls of Alexander VI, on which, as its *magna charta,*
Spain founded its right, all the regions which had been,
or should be discovered, were bestowed as a free gift
upon Ferdinand and Isabella. They, and their succes-
sors, were uniformly held to be the universal proprietors
of the vast territories acquired by conquest in the New
World. From them, all grants of land flowed. It is
true, that when towns were built, and formed into bo-
dies corporate, the citizens were allowed to elect their
own magistrates, who were authorised to adopt measures
for the regulation of their own interior commerce and
police. But no political power originated from the peo-
ple—all centred in the crown, and the officers of its nom-
ination. The Viceroys, who represented the person of

9 P                    75

their sovereign, possessed his regal prerogatives within the precincts of their own governments, in their utmost extent. Like him, they exercised supreme authority in every department of government, civil, military and criminal. And, as their dominions were too extensive for their personal supervision, they, in turn, were represented by various orders of magistrates,—some appointed by the King, others by the Viceroys,—all of whom were amenable to the jurisdiction of the latter; unless they were required to execute their duties, without the limits of eitheir of the viceroyalties—(Robinson's Am. 350, 351, 352; 2 vol. Prescott's Ferdinand and Isabella, 172, 173, 174, 486, 493, 494, 495.)

Thus we discover, that the Spanish monarch possessed an unlimited control over his American colonies, and that his viceroys, and other subordinate officers, exercised an extensive power—that he, and not the state, was the proprietor of the territories there acquired. Being vested with the property, surely it was competent for him to make such disposition of his foreign possessions, as caprice, or a sense of justice might dictate. The canons of the civil law, or the legislative regulations of Spain, were not recognised by its monarch, as operating to restrain him in making grants of land in the New World. And it must therefore be immaterial, whether, according to the civil law, rivers, the sea, and its shores, are destined by nature to the common use of man, and thus withdrawn from commerce.

The territory which had, or should be discovered in America, being vested in the Spanish monarchs, it followed, that they might create a political power there, or

retain the reins of government in their own hands, and parcel out the lands to such individuals as they might, from time to time, select : and the power created, might be invested with all the incidents of property in the tide waters, of which the subject was susceptible; or the King might confer upon his grantee, a proprietorship quite as ample.

It is no answer to this conclusion, to say, that the right to the acquisitions of Spain, whether by conquest or discovery, vested in the State, and not in the King; and that the bulls of Alexander VI, could not give to the title a different destination. Soon after the return of Columbus to Spain, Ferdinand and Isabella applied to the Court of Rome, to confirm them in the possession of their recent discoveries, and invest them with an extent of jurisdiction, similar to that previously conferred on the Kings of Portugal. It was an opinion, perhaps as ancient as the crusades, that the Pope, as the head of the church on earth, had competent authority to dispose of all countries inhabited by heathen nations, in favor of christian potentates. Although Ferdinand and Isabella do not seem to have been fully satisfied of this right, yet they were willing to acquiesce in its assumption, from the conviction, that the papal sanction would most effectually exclude the pretensions of all others, and especially, their Portuguese rivals—(2 vol. Prescott's Ferdinand and Isabella, 172.) This high power being accorded to the Pope, by the catholic states of Europe, and especially, by Spain, titles acquired upon the supposition that it was rightful, cannot now be disturbed—and acquiescence, for centuries, in its legitimacy, must be held to operate as an estoppel.

The Mayor, &c. of Mobile *vs.* Eslava.

Again: it has been held to be a legal presumption, "that public and responsible officers, claiming and exercising the right of disposing of the public domain, did it by the order and consent of the government, in whose name the acts were done." And consequently, grants by them of the public lands, " by color or claim of public authority, are evidence thereof, until the contrary appears by the showing of those who oppose the title set up under it, and deny the power by which it is professed to be granted." True, " a grant is void, unless the grantor has the power to make it—but it is not void, because the grantee does not prove or produce it. The law supplies this proof by legal presumption, arising from the full, legal and complete execution of the official grant, under all the solemnities known or proved to exist, or to be required by the law of the country where it is made, and the land is situated"—(United States vs. Arredondo and others, 6 Peters' Rep. 727, 728 ; New Orleans vs. The U. States, 10 Peters' Rep. 727; see also 9 Cranch's Rep. 99, and 5 Wheaton's Rep. 303.) As, then, in the absence of all proof, every proper intendment is to be made in favor of a grant, bearing on its face the evidences of regularity and authenticity, we must suppose that the officer making it, was duly accredited by his government ; and that he undertook to dispose of no more of the property of his sovereign, than the laws of Spain authorised.

We are now brought to consider, whether the act of eighteen hundred and twenty-four, vested a title to the premises in dispute in the plaintiffs; and in entering upon the examination of this question, it may be well to premise, that the act of Congress cannot be held to assert a

title on the part of the United States, but is nothing more than a renunciation of whatever title the government may have, or be supposed to have had, to so much of the shore, as is described in it.

The shore of the sea, and its arms, is that space of land, which is alternately covered and left dry by the rising and falling of the tide; or, in other words, that space of land which is between high and low water marks. It is this space, to which the United States quit claim, by the act of eighteen hundred and twenty-four.

By the act of Congress, of March, eighteen hundred and three, " regulating the grants of land, and providing for the disposal of the lands of the United States, south of the State of Tennessee," it is enacted, " that all navigable rivers, within the territory of the United States, south of the State of Tennessee, shall be deemed to be, and remain public highways"—(1 vol. Land Laws, (ed. 1838,) p. 98, sec. 17.) And all the laws in regard to the establishment of territorial governments by Congress, and the survey and disposal of the public lands, whether of an earlier or later date, contain similar provisions—(Ibid. pp. 23, 56, 107, 195, 216, 365.)

The several acts of Congress, regulating the survey of the public lands, all provide for surveys which border on navigable streams, to be so made, as not to include within its lines, any part of the shore—(1 vol. Land Laws, (ed. 1838,) pp. 50, 96, 104, 191.)

In the *last proviso* of the 6th section of the act of eighteen hundred and nineteen, " to enable the people of the Alabama territory to form a constitution and State government, and for the admission of such State into the

Union, on an equal footing with the original States,"—among the propositions submitted by Congress to the convention, for their acceptance or rejection, it is declared, that "all navigable waters within the said State, shall forever remain public highways, free to the citizens of said State, and of the United States, without any tax, duty, impost or toll therefor, imposed by the State"—(1 vol. Land Laws, (ed. 1838,) 310.) By the ordinance which makes a part of the constitution of Alabama, the "convention for, and in behalf of the people inhabiting this State, do accept the propositions offered by the act of Congress, under which they are assembled."

The act of Congress of eighteen hundred and nineteen, seems to suppose, that by the admission of Alabama into the Union, the jurisdiction of the State over its navigable waters, might have been exercised, so as to exclude from their navigation, the citizens of the United States; or else the proposition we are considering, was inserted *ex majore cautela,* that collision between state and federal jurisdiction might be avoided;—but it is perhaps needless to enquire, under what influence it may have been made a matter of stipulation.

We find it also enacted, in the territorial ordinance, and the laws regulating the survey and sale of lands, in Mississippi and Alabama, that the "navigable waters" shall be and remain public highways. Here were express avowals by Congress, that they should not be surveyed and sold, but should be withdrawn from commerce. For what purpose were such avowals made? was it, in the first instance, to prevent the local legislature from authorising an obstruction of the navigation

of the waters within the territory—or was it intended, in the last instance, to furnish a pledge to those who might purchase lands of the United States, that the navigable waters should remain common property, free to the use of all? If the latter was the object proposed, it would not have been consistent with good faith, for Congress to make a grant of the navigable waters, by making that private property, which before was dedicated to the common use of all men. Without speculating further upon the intention of Congress, to be gathered from its enactments previous to eighteen hundred and nineteen, we think it sufficiently appears from the act of that year, authorising the formation of a State constitution, that the United States proposed to relinquish its right to the "navigable waters" within this State, upon an agreement by the convention, that they should "forever remain public highways, free to the citizens of said State, and of the United States, without any tax, duty, impost or toll therefor, imposed by the said State." The proposition for that purpose, is thus introduced by Congress: "Sec. 6. That the following be, and the same are hereby offered to the convention of the said Territory of Alabama, when formed, for their free acceptance or rejection, which, if accepted by the convention, shall be obligatory upon the United States."

The convention, we have already shown, accepted all the propositions submitted to it, and thus perfected the stipulation between the state and federal governments.

It is, then, considered clear, that the "navigable waters" of this State have been dedicated to the common use of the people of the United States; but perhaps it

may be considered as questionable, what extent of soil is embraced by the dedication. We think it must be so much ground as is covered with the water, not only at low, but at high tide. The government surveys extend thus far, and the shore is regarded rather as a part of the water, than as land. It is believed, that there is no instance in which the United States, after having sold the land to high water, has afterwards asserted a right to dispose of the space intervening between that and low water mark.

There is another view which may be taken of the act of eighteen hundred and twenty-four, going very satis-factorily to show that, that act does not vest in the plain-tiffs the title they assert. By the first section of the act "to enable the people of Alabama Territory to form a constitution," &c. it is enacted, "that the inhabitants of the Territory of Alabama be, and they are hereby au-thorised to form for themselves a constitution and State government, and to assume such name as they may deem proper; and that the said territory, when formed into a State, shall be admitted into the Union, upon the same footing with the original States, in all respects what-ever"—(Introduction to Aik. Dig. xxv.) There is no re-servation by the United States, of a property in the navi-gable waters of this State, or of the soil covered by them, further than we have already seen; and in order to ascertain their rights over the subject, it may be well to enquire what rights are conceded to them in the "ori-ginal States." The original States, we are to understand to be those which united in forming the Federal consti-tution. These States held their territorial rights from

the British crown. The King, in virtue of his prerogative, was authorised to create a political power in all the countries newly discovered and possessed by his subjects —(Campbell vs. Hall, 1 Cowp. Rep. 204. The royal charters invested the colonies with a political character; by which they succeeded to all the territorial interests which had previously belonged to the sovereign power of the parent country. These charters created governments, and were not construed as other grants from the crown were—that is, they did not exclude; but actually included arms of the sea, &c. The colonial governments thus had ample authority to alter the established law, with regard to their tide waters; so that the exclusive control of the subject, was vested in them—(Commonwealth vs. The Inhabitants of Charlestown, 1 Pick. Rep. 180; Angell on Tide Waters, 37 to 60.)

The right of property in the *navigable waters*, conferred upon the colonies by the royal charters, have never been relinquished to the United States. True, the power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," invests Congress with the right of *empire and jurisdiction* over the navigable waters of the country, so far as the exercise of this constitutional power may render it necessary. But the right of property, which was given to the "original States," by the King of Great Britain, when they were his colonies, is still retained, and can only be interfered with by the Federal government, to preserve a free navigation. The United States, then, may be said to claim for the public an easement for the transportation of mer-

9 P 76

chandise, &c. in the "navigable waters" of the "original States," while the right of property remains in the States.

The "original States" possessing this interest in the waters within their jurisdictional limits, the *new States* cannot stand upon an equal footing with them as members of the Union, if the United States still retain over their navigable waters, any other right than is necessary to the exercise of its constitutional powers.

In New Orleans vs. The United States, (10 Peters' R. 736,) the court were of opinion, that though the property in dispute was dedicated to the public use, so that the King had not the power rightfully to alien it; yet he had a limited power over it for certain purposes. But they say the treaty by which Louisiana was ceded to the United States *could not*, and the constitution *did not*, transfer to the Federal government the right to exercise the power which, previous to the treaty, was vested in the King.

"Special provision," say the court, "is made in the constitution, for the cession of jurisdiction from the States, over places where the Federal government shall establish forts, or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction.

"The State of Louisiana was admitted into the Union, on the same footing as the original States. Her rights of sovereignty are the same—and, by consequence, no jurisdiction of the Federal government, either for purposes of police or otherwise, can be exercised over this public ground, which is not common to the United States. It belongs to the local authority to enforce the trust, and

The Mayor, &c. of Mobile *vs.* Eslava.

prevent what they shall deem a violation of it by the city authorities.

"All powers which properly appertain to sovereignty, which have not been delegated to the Federal government, belong to the people."

Here, we think, is a clear concession, that the rights of sovereignty of the *new*, are quite as extensive as those possessed by the *original States*—and that the powers pertaining to sovereignty, which have not been delegated, belong to the States, or the people. The constitution does not, in *express terms*, delegate an interest in the navigable waters of the States, to the Federal government; and as the power to regulate commerce, by implication, gives only an easement,—it will follow, that the right of property belongs to the States.

Further: the act of eighteen hundred and nineteen, submits to the convention several propositions for their acceptance or rejection, which are intended to operate when accepted, as reservations in favor of the Federal government. None of these propositions reserve a right of property in the navigable waters; this right must, then, be understood to have been yielded to the State, upon the maxim of *expressio unius est exclusio alterius.*

To recapitulate, we are of opinion—

1. That the "navigable waters" within this State, have been dedicated to the use of the citizens of the United States, so that it is not competent for Congress to grant a right of property in the same.

2. The navigable waters extend not only to low water, but embrace all the soil that is within the limits of high water mark.

3. By the acts of Congress regulating the survey and disposal of the public lands, the Federal government has renounced *the title* to the navigable waters, and the soil covered by them; consequently, the plaintiffs cannot recover on the ground of a dedication to the uses of the city, under the act of eighteen hundred and eighteen, which is an enactment of a later date.

4. The original States, in virtue of their royal charters, are entitled to the right of property in the navigable waters within their territory, while the public are only entitled to an easement, to be provided for under that provision of the Federal constitution, which authorises Congress to regulate commerce, &c. Alabama is admitted into the Union, on an equal footing with the "original States," and of consequence, is entitled to the right of property in the tide waters within its limits.

5. By the admission of Alabama into the Union, without a reservation of the right of property in the navigable waters, the State succeeded to all the right of the United States, except so far as it was reserved by the Federal constitution in some of its grants, or its retention was necessary to enable the Federal government to exercise its delegated powers.

Having attained these conclusions, it will follow, that the act of eighteen hundred and twenty-four is inoperative, and confers no title upon the plaintiffs. It is, then, unnecessary to examine the questions of law raised upon the bill of exceptions; inasmuch as the plaintiffs showed no right to recover, it is clear, that they were not prejudiced by the several decisions of the Circuit judge, adverse to their pretensions.

Many other interesting questions were discussed at the bar, which (as they are not material to a decision of the case,) we will decline considering.

The judgment of the Circuit court is affirmed.