SIESTA PROPERTIES, Inc. v. HART, et al.

No. 10679.

Circuit Court, Sarasota County.

July 25 and August 13, 1958.

158

²AMENDED ANSWER OF LOUIS C. HART, IRENE M. HART, WALTER A. SMITH, BESS L. SMITH and HAZEL C. BENNING

Come now the Defendants, Louis C. Hart, Irene M. Hart, Walter A. Smith, Bess L. Smith and Hazel C. Benning, by their undersigned attorney, with leave of the Court first had and obtained, and file this their amended answer to the Complaint, as amended, filed against them in the above styled cause, and say:

1. Each and every allegation of Section 1 of the complaint as amended and supplemented are denied.

William T. Harrison, Jr. and George A. Dietz of Williams, Parker, Harrison & Dietz, Sarasota, for plaintiff.

2. Each and every allegation of Section 2 of the complaint as amended and supplemented are denied.

3. The allegations of Section 3, Subsection A of the Complaint are admitted, as of the date the original complaint was filed, but it is alleged that Walter A. Smith and wife, Bess L. Smith, have sold and conveyed their moiety and interest in said lands referred to as Parcel 2 in the complaint to Hazel C. Benning by Warranty Deed dated the 10th day of October, 1955, recorded in Deed Book 359, page 574 of the Public Records of Sarasota County, Florida, and application is made to substitute the said Hazel C. Benning and make her a formal party defendant in this cause for and in place and stead of the said Walter A. Smith and wife, Bess L. Smith. All other allegations of Section 3 of the complaint not above admitted are denied for want of knowledge and information sufficient to form a belief.

4. Each and every allegation of Section 4 of the complaint as amended and supplemented are denied, and these defendants allege that the lands described in Section 4 of the complaint by general boundaries are not now and never have been a part of U.S. Lot 5 as alleged, and these defendants further allege that no part of U.S. Lot 5 has been in existence for more than 20 years, as it had completely washed away in 1926.

5. The allegations of Section 5 of the complaint are denied and it is alleged that Hazel C. Benning is now the owner of a one-half undivided interest and Louis C. Hart and wife, Irene M. Hart are the owners of the other one-half undivided interest and in possession of all the lands described in Section 3, subsection A of the complaint as Parcel 2.

6. These defendants are without knowledge of the allegations of Section 6 of the complaint.

7. These Defendants are without knowledge of the allegations of Section 7 of the complaint.

8. These defendants are without knowledge of the allegations of Section 8 of the complaint.

9. It is admitted that U.S. Lot 5, and certain lands to the north and south thereof formerly existed as a part of an island known as Casey's Key lying between the Gulf of Mexico on the west and Little Sarasota Pass on the east, and that Parcel 2 was located on an island known as Siesta Key and that Parcel 2 was bounded on the west by Little Sarasota Pass and it is alleged that on April 9, 1925, it was located as shown on Coast and Geodetic Survey No. 1256; that at that time and for many years before, Little Sarasota Pass was and had been a body of water approximately 100 yards wide opposite Parcel 2 on the west containing a navigable channel commonly used by boats as a route between Little Sarasota Bay and the Gulf of Mexico and so remained until the storm of 1926.

10. Answering Section 10 of the Complaint as amended, these defendants say they are in possession of the lands described in the bill as Parcel No. 2, the western boundary of which extends to the waters of the Gulf of Mexico; and defendants deny that any lands belonging to the Plaintiff have gradually moved over and annexed to the lands owned by these defendants, and further deny that the Plaintiff has any right, title or interest to any part of Parcel No. 2.

11. These defendants are without knowledge as to the truth of the allegations of Section 11 of the complaint.

12. The allegations of Section 12 of the complaint are admitted.

13. The defendants are without knowledge as to the allegations of Section 13 of the complaint.

14. All of the allegations of the complaint as amended, not hereinbefore specifically admitted, are hereby denied.

15. Further answering the Complaint, these defendants allege and charge the facts to be that they and their predecessors in title have held open, notorious, con-

160

Courtnay C. Hamilton and Clyde H. Wilson, both of Sarasota, for Louis C. and Irene M. Hart, Walter A. and Bess L. Smith, and Hazel C. Benning.

Evans, Glenn & Kreag, Sarasota, for James B. and Elizabeth H. Peppe.

Thomas W. Butler, Sarasota, for Robert E. and Gertrude Graetz and R. A. and Mary Holman.

Clyde H. Wilson, Sarasota, for F. S. and Lina J. Dixon.

Burket, Burket & Smith, Sarasota, for Alice W. Beebe.

L. L. FABISINSKI, Circuit Judge.

*Opinion:* Siesta Key is an off shore island in Sarasota County, which with other keys or islands extending in a chain roughly parallel to the mainland, to a large extent enclose the waters known as Sarasota Bay, sometimes designated as Little Sarasota Bay.

The defendants are the owners of properties on the west bank of Siesta Key. Westwards from Siesta Key is another island or key, known as Casey Key. Between Siesta Key and Casey Key and

tinued, adverse, uninterrupted possession of the lands described in the bill as Parcel 2, hereinafter referred to as said lands, for more than seven (7) years prior to the filing of the complaint herein; and defendants allege that the western boundary of said land is the Gulf of Mexico; that said possession has been under claim of title exclusive of any other rights claiming under written instruments and have paid all taxes levied and assessed thereon during said period, and prior to and during said seven year period, have constructed valuable improvements on the premises, including a home, trailer park, inclosed the property by substantial fences except the foreshore which could not be inclosed; and actually occupying the dwelling on the premises and otherwise exercised full possession, ownership, dominion and control over said property claiming under written instruments adverse to plaintiff and to the world at large.

16. That defendants further answering the complaint, allege that their immediate predecessors in title were the owners and in actual possession of said land long before and at the time plaintiff claimed to have taken title or secured deeds to same; that plaintiff took said deed or title with full knowledge and subject to all the rights and interests of these defendants, including their right to possession of this small tract of land comprising less than 2 acres, described as Parcel 2, as aforesaid.

17. Further answering the complaint, these defendants say that Plaintiff saw or should have seen that these defendants' predecessors in title were in adverse possession of this property when Plaintiff acquired a deed to said U.S. Government Lot 5, and the Plaintiff saw or should have seen that at the time and after it acquired its deed, that these defendants and their predecessors in title were making valuable improvements on the premises, spending thousands of dollars installing a trailer park, known as Gulf Beach Trailer Park, and otherwise improving the property at great labor and expense, which improvements would not have been made had Plaintiff made known to these defendants and their predecessors in title that it had or claimed any interest in said parcel as bounded by the Gulf of Mexico on the west, as aforesaid; in fact plaintiff has never asserted any interest in said Parcel No. 2 bounded on the west by the Gulf of Mexico prior to filing this suit.

That this inexcusable, unexplained and unreasonable delay of plaintiff for more than 10 years, in asserting its claim under the circumstances, constitutes laches and works a hardship upon these defendants which equity should not condone, hence these defendants plead laches and estoppel as a defense.

Courtnay C. Hamilton
Attorney for Louis C. Hart, Irene M. Hart, Walter A. Smith, Bess L. Smith and Hazel C. Benning.
2033 Main St., Sarasota, Fla.

in front of the lands involved in this cause there was formerly a body of water known as Little Sarasota Pass.

Prior to 1921, just north of the northern boundaries of the properties here involved there existed an inlet, which bisected Casey Key, and was the customary method of ingress and egress into and out of Sarasota Bay in this locality for small boats desiring to travel in and out of Sarasota Bay, to and from the Gulf of Mexico.

In a heavy storm occurring in 1918, the waters of Sarasota Bay broke through Casey Key at another location, south of the lands here in controversy. This inlet, being much more in the direct line of flow of waters between the Gulf and the main body of Sarasota Bay, gradually widened and became a much more convenient and natural passage for water craft plying between the Gulf and points bordering on Sarasota Bay. It is called Midnight Pass, and is to all intents and purposes a permanent passage, although (not significant in this case) it has wandered up and down Casey Key for distances variously estimated in hundreds of feet.

When Midnight Pass was formed the flow of tidal waters in and out of Sarasota Bay followed the lines of least resistance, utilized Midnight Pass and reduced greatly the strength of the current in Little Sarasota Pass northwards to Little Sarasota Inlet, resulting, eventually, probably prior to the year 1926, and certainly not long thereafter, in almost completely closing Little Sarasota Inlet. Artificial filling finally completely closed it. The north end of Little Sarasota Pass formed an enclosed lagoon, now known as Heron Lagoon. The pass to the south of Little Sarasota Inlet remained open and usable for shallow craft down to Midnight Pass until the hurricane of 1926. Casey Key in this location as a result became an elongated peninsula extending from the former Little Sarasota Inlet to Midnight Pass or Inlet.

In the hurricane of 1926 Casey Key to all intents and purposes disappeared in front of and for some distance to the north and south of the lands of all of the defendants. What became of the surface soil which formerly constituted Casey Key is a matter of debate in this cause, and various theories have been advanced to account for the moving of a rather extensive area of land surface by the force of the hurricane. Whatever the answer may be, Little Sarasota Pass, which formerly was the western boundary of the properties of the defendants, and which properties undoubtedly were invested with all the privileges of riparian ownership, was completely filled up in front of the lands of the defendants, and

they have ever since had an unobstructed frontage on the Gulf of Mexico, with a more or less broad expanse of vacant beach land between their properties and the Gulf.

There have been some minor changes in ownership of the lands now belonging to the defendants, and one major change. The latter is denominated major, because in the conveyance to one of the defendants, the deed described the property as extending to the Gulf of Mexico. This does not appear in conveyances to the other defendants; all their deeds reciting Little Sarasota Pass as the water boundary. This may be significant as to the favored owner, since the defenses of estoppel, and of laches, are pleaded by all defendants.

Plaintiff is the successor in fee simple title of Casey Key. No claim to any part of the lands involved in this cause was urged, either informally, or by litigation, until the filing of this suit in the year 1954. There is some evidence, conflicting in nature, that plaintiff made known its claim to some of the defendants in 1953, but its claim was not recognized by any of them to the extent that it would bind them in this litigation. It did arouse some curiosity, speculation and slight inquiry, but the court attaches little significance to the notice supposedly charged to the defendants in this manner. Of course, the bringing of suit was forcible notice of plaintiff's claim.

Plaintiff in this suit to quiet title in itself to all beach land extending to the waters of the Gulf, is acting upon the theory that such beach land is wild and unimproved; that plaintiff is the fee simple owner of the title thereto, because such beach land is the identical land which formerly constituted Casey Key; that Casey Key was destroyed by an avulsion, and that the surface soil of Casey Key is the same soil that now exists between the boundaries of defendants' land and the Gulf. In the alternative plaintiff claims that such land is an accretion inwards towards Siesta Key from Casey Key, and that plaintiff is the owner of such accretions; and if not the sole owner, that legal apportionment of such accretions be made between defendants and plaintiff.

Plaintiff has neither alleged or proved seizin. It is not established that any of the land in controversy is in the same physical or geographical location as any part of Casey Key formerly occupied, so seizin, it seems to the court, will not be presumed from the recording of the deed, even if it contains covenants of warranty. However, since the case may be more satisfactorily disposed of on other grounds, and defendants not having raised that issue, it will be disregarded.

Defendants on their part claim that the lands involved are accretions to their properties; that the plaintiff is guilty of laches, having waited about 28 years to urge its rights in the land, during which at no time was there any intimation that any one would or could claim that the land was formed by an avulsion; they claim that plaintiff is estopped; they claim title by adverse possession.

This claim of adverse possession may be disposed of rather summarily. The best that can be said is, that what were shown as acts of possession were at most the type described as "scrambling." Only in the case of the defendant Hart was there a fencing in of the area claimed by that defendant, and in the course of time parts of the fence towards the Gulf were drawn back because of many acts of breaking of the enclosure. If it is later established that such area is capable of being acquired by adverse possession, the Hart claim should and will be re-examined.

The claim of defendants that the area involved is theirs by right of accretion can also be readily disposed of. It seems to be a settled principle of law that in order for an owner of land bounding upon water to claim additions to such land as accretion, such accretion must begin upon the land of such riparian owner and not upon some other place from which it may eventually extend until it reaches the claimant's land. Gubser v. Town (Oregon 1954), 273 Pac. 2d 430. This case may express a dictum, but all other cases studied bear out the expression, and it is so stated in the encyclopedias and texts. In the National Reporter System this principle is classified under Key Number 44 (1), Navigable Waters.

Under no circumstances shown in evidence could the defendants claim that the beach land, now existing in front of their lands, formed outward from the properties. The channel of Little Sarasota Pass was directly adjacent to the boundaries of their lands, without sloping shore lines. The testimony as a whole shows without question that all the soil deposited in the channel and against their properties came from elsewhere—most conceivably from the surface soil of Casey Key, or possibly from the submerged soil of the Gulf.

Although 28 years have passed since the formation of the beach land, the court is of the opinion that laches has not been shown except in the case of the Hart property. The purchasers of this land took without notice of the claim of plaintiff, would not have purchased unless the land did actually border on the Gulf, and took under a warranty deed describing the land as bordering on

the Gulf. As against the claim of plaintiff, they are entitled to urge the defense of laches, and have established laches by the evidence in the case relating to their property. No estoppel has been shown by any defendant against the plaintiff or its predecessors in title.

So far as the title of the property is concerned as it relates to Casey Key — as it was originally geographically located — the court is convinced that plaintiff still owns the submerged land under which Casey Key lay, if there is any reasonable probability that it may reappear to the surface as the result of natural causes. This is a universal rule and no case has been found to the contrary. The doctrine arose in the very early formation of English common law, and has been followed without known exception in this country. The following illustrative cases are mentioned, but they represent only a few of those available — Navigable Waters, 65 C. J. S., sec. 86; Mulvy v. Norton (N. Y. 1886), 3 N. E. 581 (well documented) ; Randolph v. Hinck (Ill. 1917), 115 N. E. 182; Public Beach, etc. City of N. Y. v. W. 10th St. Realty Corp. (N. Y. 1931), 176 N. E. 173 (Cardozo, J.) ; Baumhart v. McClure (Ohio Ct. of App. 1926), 153 N. E. 211. See also In re Pt. Lookout, Town of Hempstead, 144 N. Y. S. 2d 440.

Also plaintiff has the right to bulkhead the area which was formerly Casey Key, and fill in the land by artificial means and thus recover his lands, if practicable. (Cases cited.)

However, there is no reasonable probability of the reappearance of the land by natural causes. It may be practicable to fill in the lands, but there is doubt whether the boundaries can be accurately located, and the practicability is somewhat doubtful.

There is no doubt in the mind of the court that if by accretion during the interval between 1926 and the present, such accretions are now in the same geographical location as Casey Key formerly occupied in any part, they are the property of plaintiff, and an opportunity to establish by evidence that there are such accretions will be allowed, if plaintiff so requests.

The court is convinced that none of the lands in controversy constitute an accretion to Casey Key.

It has been said upon dubious authority that land formed upon the seashore (as distinguished from inland tidal waters) by avulsion, becomes the property of the sovereign. It is a logical rule, since boundaries do not change as the result of an avulsion, and lands formed upon submerged lands belonging to the sovereign

should become part of the property to which they attach. But it is not necessary to elaborate upon that point here.

It is true, however, as pointed out in the cases already cited, and elsewhere, that boundaries do not change by avulsion. This doctrine seems to the court to be decisive of the questions here involved. Plaintiff relies on the doctrine (supported in no case directly which the court has been able to find as relating to seashores, except in a remark by a judge in an early English case) established in many cases relating to avulsion in rivers, that where the identical land can be traced to another location, moved as a result of an avulsion, the owner may follow it, and reclaim it as his property. But in no such case has the plaintiff prevailed so as to divest another land owner of his property. It may be that such cases arose in states which grant a limited right to the bed of rivers and streams to adjoining landowners. However that may be, in no case that has been cited was the doctrine applied so as to divest either a private owner or the sovereign of title to surface lands overlaid with soil moved by an avulsion. And the court cannot bring itself to hold that plaintiff can claim title held by another merely because soil which he formerly owned has moved upon the property of some other person or political organization.

In Florida submerged tidal lands are held by the state in its sovereign capacity. There is no need to cite authority for this assertion, since it is so well settled that it needs no citation of authorities. Adjoining landowners have no right, limited or otherwise, to submerged lands which will interfere with the sovereign right, or interfere with the enjoyment of the waters covering such submerged land by the public. The exception of rights given under the Butler Act are not considered because not involved here. The title to the bed of the stream of Little Sarasota Pass when it was a navigable stream was in the state of Florida, and the court is of the opinion obiter dictum that such title was not divested by the filling up of the pass as the result of an avulsion. The fact that the soil which filled it came from land owned by the plaintiff's predecessor in title on Casey Key, does not alter the situation. This view is fortified by two cases which, though only persuasive authority, not being from a court of last resort, are nevertheless representative of logic which ought to be applied here. See United States v. Eldridge, 33 Fed. Supp. 337 (D. C. Mont. 1940), and Wittmayer v. United States, the latter a Circuit Court of Appeals case in 118 Fed. 2d 808, text page 810. There the bed of the Missouri River was uncovered by an avulsion which resulted in a part of the river seeking another bed. Title to the bed of the river

as originally constituted was in the state of Montana. The passage of time caused adding of soil to the vacated bed, and it became valuable as farm land. The holding in both cases (in the same circuit) was that the avulsion did not change boundaries of ownership, and that the state of Montana remained the owner of the bed of the stream.

Since the avulsions in the present case occurred before the passage of the recent legislation transferring title of sovereignty lands to the Internal Improvement Commission, obiter dictum, it seems to the court that the title to the lands involved remains in the state of Florida in its sovereign capacity.

It is possible that accretions have added to the shore line to the point that some part of such accretions are now on the land of the plaintiff, that is, have reconstituted part of Casey Key. If so, as already indicated, if this can be established, plaintiff is entitled to that portion.

It is remarkable, as pointed out by Judge Richard H. Hunt in his helpful article "Riparian Rights in Florida", University of Florida Law Review, vol. 8, 1955, page 393, that there is such a "paucity of Florida decisions on the subject [riparian rights] [that] led one writer to remark that in searching for a Florida rule 'the ironic spectre of 30,000 lakes and no case law arises.' " The court is indebted to the parties for an excellent presentation of the case in evidence, and on final argument. They, too, found the dearth of authority disheartening.

*Supplemental opinion*: Since the writing of the original opinion in this case, further study of the authorities compels the conclusion that the two paragraphs which intimate that the plaintiff might be entitled to accretions from the mainland if such accretions reach to and restore part of the island in the location from which it was washed away, should be withdrawn.

The case of Buse v. Russell, 86 Mo. 209, is a case on point. A digest of this case is contained in a note to Coulthard v. Stevens, 84 Iowa 241, the note being in 35 American State Reports, at page 313. The case so annotated should be read in connection with the instant case.

Also, the court has determined that the law of avulsion insofar as it is attempted to be applied in this case, should be rejected as the law of Florida, partly because of the authorities which exclude such theory applied to seashores—an example of the reasoning of this principle may be found in Ker & Co. v. Couden, 223 U. S. 268,

32 S. C. 284—and also the theory is rejected because of the impracticability of applying it intelligently. The cited case is based on civil law, which Louisiana follows.

But no case has been cited to the court to compel a contrary conclusion under the common law; and the court believes it preferable to adopt a firm principle of law on avulsion in this state as it relates to land areas washed by the Gulf or by the sea (as distinguished from rivers) than to leave the question open to uncertainty, and thus encourage vexatious and ingenious litigation.

In any event, as the court has already announced orally to counsel for the parties, the court has made a finding of fact that the lands formed against the uplands of the defendants cannot be identified as the lands which formerly constituted Casey Key in that area.

Nothing said in this or the original opinion should be construed as *determining* the ownership to the property in question as being in the state of Florida. The state was not a party, and reference to the state as being the likely beneficiary of the hurricanes which precipitated the formation of the land area in question was incidental. The final determination of the ownership of the land in others than the parties to this case is left open for adjudication— if the occasion arises to make any such adjudication.

In summary, the court has rejected the claims of the parties plaintiff and defendant to the land, and it is not called upon to affirmatively declare the ownership otherwise. In fact, since the answers of defendants are defensive in nature, and do not pray for any affirmative relief, much of what has been said in the opinion should be read in the light of the issues as framed.

A list follows of the cases studied by the court in connection with this case which were considered of sufficient bearing to justify noting especially, together with, in some cases, a brief mention as to the holding of the court—

Arkansas v. Tennessee, 38 S. C. 301. River bottoms. Avulsion. Accretions on semi-dry bed belong to state.

A. G. Wineman & Sons v. Reeves (C. C. A. 5), 245 Fed. 254. As above.

Siddall v. Hudson (Ct. Civ. App. Tex.), 201 S. W. 1029, 206 S. W. 381. Same effect.

Earl v. McCarty (Fla.), 70 So. 2d 314. On unmarked spaces near water.

State v. Gill (Ala.), 66 So. 2d 141. Excellent discussion—avulsion confers title on state but dictum in that case. Hagan v. Campbell (1838), 8 Port. 9, and Mayor of Mobile v. Elava (1839), 9 Port. 577, discussed. Artificial accessions by third persons belong to upland owner.

Coulthard v. Stevens, 84 Iowa 241, 35 Am. St. Rep. 304. Found accretions, not avulsions, gave title to upland owner—definition of avulsion unusual, as it appears to make avulsion dependent on identification. Valuable note to this case.

Noyes v. Collins (Iowa), 61 N. W. 250. Lake bed dried and filled by natural and artificial causes—held avulsion and no change in boundaries.

Cooley v. Golden, 117 Mo. 33. Avulsion.

Peterson v. City of St. Joseph (Mo.), 156 S. W. 2d 691. Island extended itself to mainland—held, not accretion to mainland.

DeLassus v. Faherty (Mo.), 64 S. W. 183, 58 LRA 193, 72 Am. St. Rep. 269. See note to latter, page 281, accretions, last sentence on page.

Fowler v. Wood, 73 Kan. 511, 85 Pac. 763, 117 Am. St. Rep. 534. Excellent case for general reading as to issues in this case.

Rees v. McDaniel, 115 Mo. 145, 21 S. W. 913. Succinct statement. Case involves island washing away and reappearing. Law applied much as I have viewed it in my memorandum. Holds boundaries do not change by reason of avulsion.

Naylor v. Cox (Mo.), 21 S. W. 589. Excellent succinct statement of law on accretions as applied in Missouri, and bears out my conclusions.

Linthicum v. Coan, 64 Md. 439, 2 Atl. 826, quoted in Wagner v. City of Baltimore (Md.), 124 Atl. 2d 815; Hogue v. Bourgois, 71 N. W. 47.

Miami Corporation v. State (La.), 173 So. 315. Beds of navigable waters formed by subsidence become property of state.

65 C. J. S. sec. 86-B. Navigable Waters. Title not divested by avulsion, whether covered, uncovered or shifted.

Mulvy v. Norton (N. Y. 1886), 3 N. E. 51. Land lost by submergence regained by later reliction and avulsion. Well documented case.

Randolph v. Hinck (Ill. 1917), 115 N. E. 182. Boundaries do not change by avulsion, submerged island reappearing, property original owner.

Public Beach, etc. City of N. Y. v. W. 10th St. Realty Corp. (N. Y. 1931), 176 N. E. 173. Title to land submerged by avulsion remains in grantee of original owner. (Cardozo, J.)

Baumhart v. McClure (Ohio Ct. of App. 1926), 153 N. E. 211. Holder legal title land lost by submergence has title on reappearance by accretion or reliction.

New York v. Realty Associates (N. Y.), 176 N. E. 171. Lands lost by avulsion for 30 years—held, title still in owners. See also In re Pt. Lookout, Town of Hempstead, 144 N. Y. Supp. 2d 440.

Gubser v. Town (Oregon 1954), 273 Pac. 2d 430. Headnote 2. Accretions must begin upon land of party who claims the newly made land, and not upon some other place from which it may eventually extend until it reaches the claimant.

3 Miami Law Quarterly 339. 8 Univ. of Fla. Law Review 393. No help on avulsion, but helpful otherwise.

Banks v. Chicago Mill & Lumber Co. (D. C. Ark.), 92 Fed. Supp. 232. Material on tax payments as notice.

Butts v. Cummings (Cal. Dist. Ct. of App. 1953), 256 Pac. 2d 52. Indefinite but applies avulsion theory.

State v. Longyear Holding Co. (Minn.), 29 N. W. 2d 657. Good case of "sovereignty" as distinguished from "proprietary"—also as to state ownership of bed of stream when uncovered, but leaves open title if "permanently" uncovered (?).

Humble Oil & Refining Co. v. Sun Oil Co. (C. C. A. 5), 190 Fed. 2d 191. Good case for general purposes and reading— partly applicable—title held in state. See also 191 Fed. 2d 705, same case on rehearing.

Ker & Co. v. Couden, 223 U. S. 268, 32 S. C. 284. Excellent case on civil law development—accretions and accessions to seashore, as distinguished from rivers, belong to sovereign— civil law.

In order to put at rest the relative locations of Casey Key and the present shore line of Siesta Key, the court makes the following finding of fact—

The plat made by Carl Johnson, consequent upon a survey made by him during the progress of the trial of this case, introduced in evidence as plaintiff's exhibit AA, showing the relative location of the meander line of Casey Key (U. S. Government Lot 5) as of the year 1909 and the high water mark of the Gulf of Mexico, as of August 13, 1957 (the date of said plat), is found to correctly repre-

sent those relative lines and locations, and is adopted by the court as being a correct representation of the properties involved in this proceeding, insofar as the plat purports to represent the end result of the various changes occurring in the location of the land areas discussed in the pleadings and evidence—provided, however, that the court found it unnecessary to determine the accuracy of the lines indicating the shifting of Casey Key towards the mainland arising out of the normal action of wind and sea over the period from 1909 to 1957.

*Final decree as to certain defendants, July 25, 1958:* This cause came on to be heard on the motion of the defendants Louis C. Hart and Irene M. Hart for the entry of a final decree as to that portion of the lands described as parcel #2 in plaintiff's complaint, which is in controversy in this cause. The court has considered the pleadings, heard and considered the testimony and argument of counsel.

It has been demonstrated that because of circumstances peculiar to the defendants Louis C. Hart and Irene M. Hart a hardship would be worked on them if the court did not enter this final decree at this time.

The court finds—

1. That the defendants Louis C. Hart and Irene M. Hart, husband and wife, and Walter A. Smith and Bess L. Smith, husband and wife, received a warranty deed to the following described lands executed by the defendants Lina Jones Dixon and Fernie Dixon, husband and wife, on September 14, 1954, said deed being recorded in deed book 333, page 487 of the public records of Sarasota County, to wit—

Begin at the intersection of the Westerly right-of-way of Midnight Pass Road and a line 710 feet South of and parallel to the North line of U. S. Lot 3, Section 32, Township 37 South, Range 18 East; thence West and parallel to said North line of U. S. Lot 3, 664.5 feet to shore line of Gulf of Mexico; thence North 22 degrees 07' 40" West along shore line of Gulf of Mexico, 108.06 feet; thence East and parallel to North line of said U. S. Lot 3, 650.65 feet to the East right of way of Midnight Pass Road; thence South 28 degrees 40' 06" East, 113.72 feet along the chord of a curve to the right to the point of beginning; together with riparian rights.

2. That at the time the defendants Louis C. Hart and Irene M. Hart, husband and wife, purchased the above described lands from the defendants Lina Jones Dixon and Fernie Dixon, husband and

wife, by the aforesaid deed describing the tract of land between Midnight Pass Road and the Gulf of Mexico, by a metes and bounds description, said purchasers had no actual knowledge that the plaintiff claimed that portion of the above described tract lying west of the western meander line of U. S. Government Lot 3 of section 32, township 37 south, range 18 east. The purchasers would not have bought the land from the defendants Lina Jones Dixon and Fernie Dixon if it had not actually bordered on the Gulf of Mexico.

In view of the foregoing circumstances it is the opinion of the court that the plaintiff is barred by the doctrine of laches from maintaining the present suit, insofar as it relates to a claim of title by plaintiff to the above described tract of land or any portion thereof.

It is ordered, adjudged and decreed that plaintiff's complaint is dismissed, with prejudice, as to the portions of the tract of land described in paragraph 1, above, which are claimed by plaintiff.

This decree is effective only as to said parcel of land and is to be in nowise construed as prejudicing the rights of plaintiff in and to the remaining parcels of land involved in this suit, which will be adjudicated by a subsequent decree of this court.

*Final decree, August 13, 1958:* The testimony and documentary evidence in this cause were submitted and introduced in open court before me. Said evidence and testimony, together with argument of counsel, has been duly considered on final hearing.

Final decree as to the defendants Louis C. Hart and Irene M. Hart has been heretofore entered by the court, dated July 25, 1958.

The decree entered this date relates to all other parties in the cause. This decree is based upon findings of law and fact contained in an opinion and supplemental opinion filed herein.

It is ordered, adjudged and decreed that the complaint, as amended, is dismissed, and that the defendants and each of them go hence without day.

It is further ordered, adjudged and decreed that the costs of this proceeding shall be paid by the plaintiff to the defendants, but in the event taxable costs cannot be agreed upon by the parties, the defendants may hereafter so show to the court and the court, upon due notice to attorneys for plaintiff, will then judicially determine the amount of taxable costs and enter a formal decree requiring such payment. Jurisdiction for that purpose is reserved.